IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Equal Employment Opportunity Commission, )<br>)<br>Plaintiff, )<br>)<br>and )<br>)<br>Carol Christopher, Julie Bhend, and )<br>Carmella Chamara, )<br>)<br>Plaintiff-Intervenors, )<br>)<br>vs. )<br>)<br>National Education Association and )<br>National Education Association-Alaska, )<br>)<br>Defendants. )<br>) | VIDEOTAPE<br>DEPOSITION OF<br>**DELORIS ROZIER**<br><br>COPY |

The deposition of DELORIS ROZIER was taken pursuant to the U.S. Rules of Civil Procedure, before Sarah B. Fry, a Notary Public in and for the State of South Carolina, at Four Points Sheraton, Board Room A, 2701 South Ocean Boulevard, Myrtle Beach, South Carolina on the 6th day of October, 2003, commencing at 1:06 p.m.

| | |
|---|---|
| 1 | da da da da da da da," I think I would have said something to my |
| 2 | boss. |
| 3 Q. | And that would have been? |
| 4 A. | My boss at that point was Evelyn Temple. |
| 5 Q. | Okay. And why would you have gone to Evelyn Temple about |
| 6 | that, assuming she had said she was afraid of him? |
| 7 A. | I would have gone to Evelyn, because Evelyn was, at that time, |
| 8 | the associate executive director of the NEA, and it was not our |
| 9 | business at NEA to get in affiliate's business. Tom was not an |
| 10 | NEA employee, but I would have wanted some counsel from my |
| 11 | boss around how to help this young woman. I would have |
| 12 | wanted that. And so — and Evelyn was a person that I often |
| 13 | sought counsel from. She's a friend. She's my mentor. So she's |
| 14 | a person that I would have gone and had a very open and candid |
| 15 | discussion about it. |
| 16 Q. | Would there have been anything NEA could have done about the |
| 17 | situation? |
| 18 | MR. COLLINS: Objection. |
| 19 A. | I don't know that. |
| 20 Q. | So you mentioned earlier that Karen Floyd called you on two |
| 21 | occasions, which we have discussed. Did she call you again? |
| 22 A. | I didn't hear from Karen again until the summer during the |
| 23 | representative assembly, when we were in New Orleans. |
| 24 Q. | Was she in New Orleans? |
| 25 A. | No. |

| | | |
|---|---|---|
| 1 | Q. | Okay. Were you involved in discussions with Mr. Diebold or |
| 2 | | any other NEA employee about whether Mr. Harvey would |
| 3 | | continue in the USEDP program after going to Alaska? |
| 4 | A. | Mr. Diebold shared with me on one occasion the fact that Tom |
| 5 | | was interested in continuing to be part of the — he was more |
| 6 | | concerned about his retirement. He didn't use the word |
| 7 | | "USEDP." He used the word, "retirement system." |
| 8 | Q. | And did Mr. Diebold share with you what Mr. Harvey's |
| 9 | | concerns were? |
| 10 | A. | Just that he wanted to continue his participation in the NEA |
| 11 | | retirement system. |
| 12 | Q. | Do you know whether Mr. Harvey participated in the NEA |
| 13 | | retirement system while in Mississippi? |
| 14 | A. | I would imagine that, if he was part of the USEDP, that that |
| 15 | | might be true. I don't know that for a fact, but that is part of the |
| 16 | | USEDP program. |
| 17 | Q. | Do you know whether, as a participant in the USEDP program, |
| 18 | | Mr. Harvey was an employee of NEA? |
| 19 | | MR. COLLINS: Objection. Calls for a legal conclusion. |
| 20 | A. | The participants in the USEDP are never employees of the NEA. |
| 21 | | And we are very clear about that, and none of us have ever |
| 22 | | operated that way. They are controlled, managed, hired by the |
| 23 | | state affiliates, and we at NEA have nothing to do with them in |
| 24 | | terms of their actual hiring relationship with the affiliates. |
| 25 | Q. | Okay. Are you aware of any provisions in the USEDP |

| | | |
|---|---|---|
| 1 | | that was not uncommon working with any of the affiliates. |
| 2 | Q. | Okay. In your work at the Mississippi affiliate, did you have |
| 3 | | occasion to talk with the staff? |
| 4 | A. | Yes. |
| 5 | Q. | Okay. Did you have occasion to talk with the staff about Mr. |
| 6 | | Harvey? |
| 7 | A. | The staff talked to me about Mr. Harvey. I wouldn't talk to them |
| 8 | | about Mr. Harvey. |
| 9 | Q. | Okay. And what did the staff tell you about Mr. Harvey? |
| 10 | A. | That he was tough. That sometimes, some of the things that he |
| 11 | | wanted, they didn't think they could do. There was some |
| 12 | | complaining about the yelling, but he yelled at everybody, |
| 13 | | everybody, men and women. It didn't matter. |
| 14 | Q. | Okay. Who — I'm sorry. Go ahead. |
| 15 | A. | And it was sort of a — you know, in a round table type |
| 16 | | discussion where you just vent. You know, they trusted — |
| 17 | | Vade and I had the confidence of all of the individuals in the |
| 18 | | room, so we did a lot of listening. We didn't do a lot of feeding |
| 19 | | back to them information. Our job was to listen, so that we |
| 20 | | could help them. Most of it was around accountability for |
| 21 | | members, and how they had different approaches versus what |
| 22 | | Tom was wanting. |
| 23 | Q. | You said some staff members mentioned yelling? |
| 24 | A. | Uh-huh. |
| 25 | Q. | Is that right? Again, if you could ... |