```
 1  EQUAL EMPLOYMENT         *  IN THE
 2  OPPORTUNITY COMMISSION,  *  UNITED STATES
 3         Plaintiff,        *  DISTRICT COURT
 4  vs.                      *  FOR THE
 5  NATIONAL EDUCATION       *  DISTRICT OF ALASKA
 6  ASSOCIATION-ALASKA,      *  CASE NO.:  USDC Alaska
 7         Defendant.        *  A01-022SCV
 8            *    *    *    *    *
 9  DEPOSITION OF:
10            LARRY DIEBOLD,
11  was taken on Wednesday, May 29, 2002, commencing
12  at 1:00 p.m., at the Executive Center, 2217
13  Princess Anne Street, 2nd Floor, Fredericksburg,
14  Virginia, before Sherry W. Dudley, Notary Public.
15            *    *    *    *    *
16
17            COURT REPORTERS, ETCetera, INC.
18       Maryland                  Washington
19     (410) 653-1115           (202) 628-DEPO
20   "We'll cover your job ANYWHERE in the country!"
21              1-800-947-DEPO
```

Page 2

```
 1  APPEARANCES:
 2
    On behalf of the PLAINTIFF EEOC:
 3
         CARMEN FLORES, ESQ.
 4       U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
         Federal Office Building
 5       909 First Avenue
         Suite 400
 6       Seattle, Washington 98104-1061
         (206) 220-6893
 7
 8  On behalf of the PLAINTIFFS CHRISTOPHER, BHEND &
    CHAMARA:
 9
         TERRY A. VENNEBERG, ESQ.
10       BONJORNI & HARKNESS
         1026 Harvey Road
11       Auburn, Washington 98002
         (253) 833-5840
12
13  On behalf of the DEFENDANT:
14       LESLIE LONGENBAUGH, ESQ.
         SIMPSON, TILLINGHAST, SORENSEN LONGENBAUGH
15       One Sealaska Plaza
         Suite 300
16       Juneau, Alaska  99801
         (907) 586-1400
17
18  On behalf of the WITNESS:
19       MAURICE JOSEPH, ESQ.
         NATIONAL EDUCATION ASSOCIATION
20       1201 16th Street, N.W.
         Washington, D.C.  20036
21       (202) 822-7035
```

Page 3

```
 1                   I-N-D-E-X
 2            Deposition of Larry Diebold
 3                   May 29, 2002
 4
 5  EXAMINATION BY:                        PAGE:
 6  Mr. Venneberg                            4
 7  Ms. Flores                             113
 8  Mr. Venneberg                          131
 9  Ms. Longenbaugh                        133
10  Mr. Venneberg                          134
11
12  EXHIBITS:                              PAGE:
13  29   September 27, 1996 Memo             63
14  30   2/29/98 E-mail                      91
15  31   Series of E-mail Messages           97
16  32   2/27/98 E-mail                     102
17  33   8/26/98 E-mail                     103
18  34   9/27/98 E-mail                     105
19
20
21       (Exhibits included with transcript.)
```

Page 4

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2  WHEREUPON --
 3            LARRY DIEBOLD,
 4  a Witness called for examination, having been
 5  first duly sworn, was examined and testified as
 6  follows:
 7                 EXAMINATION
 8            BY MR. VENNEBERG:
 9       Q.  Mr. Diebold, my name is Terry
10  Venneberg, and I represent Carol Christopher,
11  Julie Bhend and Carmela Chamara in a case that
12  has been filed by the EEOC against NEA-Alaska in
13  which we are here this afternoon for your
14  deposition in that case.
15            First, I'll ask you whether you have
16  ever been deposed before.
17       A.  I have never -- I've been in
18  depositions, but I've never been deposed before.
19       Q.  Have you had an opportunity to talk
20  with Mr. Joseph about what a deposition is?
21       A.  Well, I'm familiar with what they are,
```

Case 3:01-cv-00225-JKS   Document 195-4   Filed 01/06/2006   Page 2 of 3

EEOC vs. NEA-ALASKA                                              May 29, 2002
Deposition of Larry Diebold              "We'll cover your job ANYWHERE in the country!"

Page 117

1  A. I don't recall specifically, but I'm
2  reasonably sure that I kept him informed. But I
3  don't recall when I met or what was said.
4      Q. So you don't recall -- was that
5  something that you feel that you would have been
6  required to do, to report back to him that there
7  was a situation?
8      A. No. I mean, common sense would
9  require it, but I was not under any kind of a
10 written mandate.
11     Q. What is the purpose of the guidelines
12 in this USEDP program?
13         MS. LONGENBAUGH: Objection.
14     A. My recollection of the guidelines is
15 it just sets forth the definition of what the
16 program was in terms of what states were eligible
17 or how states were eligible under the formula for
18 paying the 70/30 split and the 80/20 split. You
19 know, just general stuff.
20         I don't recall specifically how long
21 it was or what the sections were. It was just a

Page 118

1  very general thing, my recollection.
2      Q. Well, we do know from the contract so
3  far that there are at least two sections, one on
4  how to terminate a contract and one on
5  evaluations?
6          MS. LONGENBAUGH: Objection.
7      A. I don't recall.
8      Q. Now, you don't recall that, but if
9  there is a section on evaluations in the
10 guidelines, is it surprising to you that you
11 never saw any evaluations in all of the time that
12 you were Director of this program?
13     A. No, it is not surprising at all.
14     Q. Who would have they gone to then?
15     A. I don't know, but I'm not surprised,
16 because that was something that was left to the
17 states as regards to what the guidelines said.
18         The assumption was the states would do
19 evaluations or wouldn't do evaluations. It was
20 left to the states. And so it's not surprising
21 at all that I didn't see any, because I didn't

Page 119

1  ask to see any.
2      Q. And when the situation came up with
3  the contract and Mr. Harvey in Mississippi, why
4  didn't the regional director -- why wasn't he
5  involved? Wouldn't that have been Mr. Okino --
6          MS. LONGENBAUGH: Objection.
7      A. In Mississippi?
8      Q. Right.
9      A. No, it would not have been. It would
10 have been Mr. Dryer, and, you know, my
11 recollection is that we did -- Dryer was aware of
12 what was going on, and there was some discussion
13 with him. He wasn't out of the loop, so to
14 speak.
15     Q. Do you remember if he was president
16 when you met with the board?
17     A. I don't think he was. I don't recall
18 that he was.
19     Q. Okay. Now, prior to the Mississippi
20 situation, had you met Mr. Harvey before or heard
21 of him?

Page 120

1      A. Oh, sure. I knew who he was.
2      Q. And how long previous to that did you
3  know him or know of him?
4          MS. LONGENBAUGH: Objection.
5      A. I think I said earlier, I knew that he
6  was the president of the state. Many years ago,
7  I bumped into him, and I have really not had any
8  contact with him with any of his employment with
9  other states or wherever he worked in the
10 meantime, before he came to Mississippi.
11     Q. Do you have any idea how long he was
12 in the USEDP program, how many years?
13     A. My understanding is that he was only
14 in the USEDP program from the time that he
15 arrived in Mississippi until the agreements with
16 Mississippi ran their course, so it was just that
17 time that he was in the USEDP. I don't recall
18 that he was in there beforehand.
19     Q. Okay. Did you ever become aware that
20 there had been two previous EEOC charges naming
21 Mr. Harvey arising out of the Baltimore office

## Page 121

1 by --
2      MS. LONGENBAUGH: Objection.
3      MR. JOSEPH: Objection.
4   Q. -- Jeffries?
5   A. No, I have no knowledge of any
6 charge -- I don't even know what these charges
7 are.
8   Q. What do you know about why you are
9 here today?
10  A. I do not know what has been charged
11 against Mr. Harvey, and I don't care to know. I
12 have no knowledge, other than EEOC is involved in
13 this.
14      I don't have any of the specifics, and
15 I have no knowledge of anything that took place
16 before.
17  Q. Are you on medication today --
18  A. No.
19  Q. -- that would affect your memory?
20  A. Not at all.
21  Q. Okay. And how did you prepare for

## Page 122

1 this deposition?
2   A. Well, I really didn't prepare. I
3 mean, I've been retired for over two years. This
4 stuff took place several years before I retired.
5      I am retired. When I left NEA, I left
6 a lot of my memory there, and I haven't really
7 cared to resurrect it.
8      I'm trying to be helpful here, but I
9 didn't do much to prepare for it. I'm doing the
10 best that I can to remember, and that's about it.
11  Q. Let me ask you, who provides -- or
12 what sort of training does NEA provide to NEA
13 employees with regard to any subject?
14  A. I don't understand that.
15  Q. Let me narrow it down. Does NEA
16 provide EEO training to its employees concerning
17 workplace discrimination?
18  A. I'm not sure. I don't recall what the
19 nature of the training is.
20  Q. Okay. Do you know -- did you have any
21 training in the years that you were there?

## Page 123

1   A. I don't recall any specific training
2 on, as you put it, EEOC.
3   Q. In the entire time that you were
4 there?
5   A. I don't recall any, no.
6   Q. Do you know whether Tom Harvey or any
7 other state executive directors under the USEDP
8 program do any EEO training?
9   A. I don't know whether they did or not.
10  Q. Let me represent to you that we
11 deposed Pat Orrange, the Director of Human
12 Resources, in April, and she stated that she, as
13 Director of Human Resources, is not responsible
14 for EEO training for anyone under the USEDP
15 program.
16      It was her statement that she assumed
17 that it was done by that department, that
18 department took care of the USEDP individuals in
19 regard to that training.
20      MR. JOSEPH: Objection.
21      MS. LONGENBAUGH: Objection.

## Page 124

1   Q. Do you know anything about that
2 training? Was that something that you were
3 responsible for?
4   A. I had no training responsibilities.
5   Q. Do you know who did? Who had
6 responsibility for training executive directors
7 under the USEDP program for workplace
8 discrimination?
9   A. I don't know of anybody that had that
10 responsibility. I don't know who had it.
11  Q. Now, you stated earlier that NEA could
12 approve or disapprove a candidate's admission
13 into the USEDP program; correct?
14  A. Yes.
15  Q. And give me some examples of what
16 would cause a candidate to be disapproved.
17  A. I can't think of an example, because I
18 don't have any recollection of any candidate that
19 was refused, once the state had made the decision
20 to hire them.
21      So I flippantly used the example as if