did it have a policy authorizing it to take disciplinary measures against a harasser.[4]
Cf. Nichols v. Azteca Rest. Enters., 256 F.3d 864, 877 (9th Cir. 2001) (company
policy would support "reasonable care" finding where policy defined sexual
harassment, stated that employees violating policy will be disciplined, and assured
employees that they would not be subject to reprisals for making harassment
complaint). Though NEA-Alaska officials admittedly knew about Harvey's abusive
behavior, they took no steps to correct it. Cf. Montero v. AGCO Corp., 192 F.3d 856,
862-63 (9th Cir. 1999) (employer promptly corrected harassing behavior where, within
11 days of harassment complaint, it conducted thorough investigation and disciplined
or terminated harassers).[5]    NEA-Alaska therefore cannot avail itself of the
Faragher/Ellerth defense.

---

[4]  The bargained agreement in effect stated only that "NEA-Alaska will make reasonable efforts to protect employees from hostility," and that, upon receiving a report of "hostility," NEA-Alaska will "provide assistance in attempting to resolve the problem." ER162.

[5]  It is the Commission's position that a union grievance and arbitration does not generally fulfill an employer's obligation to prevent and correct harassment because decision–making under such a system addresses the collective interests of bargaining unit members, rather than an individual's rights under an employer's anti-harassment policy, and because providing a dispute resolution process does not discharge an employer's responsibility to investigate and take corrective measures. EEOC Enforcement Guidance, "Vicarious Employer Liability for Unlawful Harassment by Supervisors," at 16 n.57 (found at http://www.eeoc.gov/policy/docs/harassment.html).

## B. Tom Harvey's unrelenting abuse of female employees created a hostile work environment.

In its brief, NEA-Alaska acknowledged the evidence that Harvey yelled, screamed, banged his fists on furniture, shook his fists at people, and "generally bullied" employees. NEA-AK Br. 46. There was, in addition, evidence that Harvey lunged at women or pumped his fists so close to their faces that he made them "scared he was going to hurt" them. ER297. The record indicates that this abusive behavior was unrelenting for the female employees of the Anchorage office. Harvey's abuse was so pervasive that, as Chamara described it, "when you hear[d] the sound of his feet walking towards your area . . . , [it would] raise the hairs on your neck because you just don't know what you're going to get." ER584. On summary judgment, this evidence was sufficient to show the existence of a hostile work environment.

NEA-Alaska argues that, as a matter of law, there was no hostile or abusive work environment. Even though Harvey "generally bullied" employees, as NEA-Alaska puts it, his conduct was not actionable because "[m]any decisions . . . have rejected sexual harassment claims based on conduct that was as serious or more serious than the conduct at issue in this appeal." NEA-AK Br. 49.

NEA-Alaska's argument – that Harvey's abusive conduct was not abusive enough – is fundamentally flawed. It is well-settled that verbally abusive conduct can create a hostile work environment, especially when the verbal abuse is frequent and

11

is accompanied by physical intimidation. <u>Ray v. Henderson</u>, 217 F.3d 1234, 1245 (9th Cir. 2000) ("Repeated derogatory or humiliating statements . . . can constitute a hostile work environment"); <u>id.</u> (plaintiff stated claim where he was "targeted for verbal abuse" and "[h]is supervisors regularly yelled at him"); <u>see also</u> <u>Harris v. Forklift Sys.</u>, 510 U.S. 17 (1993) (reversing holding that work environment was not abusive where abuse consisted of frequent insults and innuendos).  Indeed, the frequency of Harvey's abuse, the fact that it was "a daily thing," ER178, is significant, for "'the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.'" <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 926 (9th Cir. 2000) (quoting <u>Ellison</u>, 924 F.2d at 878).[6]

The pervasiveness of Harvey's abuse of female subordinates distinguishes this case from the string of cases on which NEA-Alaska relies.  In <u>Kortan v. California Youth Authority</u>, 217 F.3d 1104, 1110 (9th Cir. 2000), for example, the offensive comments were "mainly made in a flurry on [a single day.]" <u>See also</u> <u>id.</u> at 1111 ("offensive conduct was concentrated on one occasion").  <u>Brooks</u> likewise involved a "single episode." 229 F.3d at 924.  As the Court put it, "Brooks was harassed on

---

[6]  Harvey's frequent verbal abuse of female employees was also "usually . . . in public." ER178.  In this context, abuse of other women can add to the climate of fear and intimidation for female employees. <u>Hall v. Gus Constr. Co.</u>, 842 F.2d 1010, 1015 (8th Cir. 1988) ("harassment directed at employees other than . . . plaintiff is relevant to show . . . hostile work environment").

a single occasion for a matter of minutes." Id. at 926. At issue in <u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 643-44 (9th Cir. 2004), the Court stated, was "[t]wo isolated offensive remarks" occurring over six months apart, and two instances when the plaintiff's supervisor yelled at him. Thus it was "only a few incidents" that comprised the basis of plaintiff's claim. And in <u>Sanchez v. City of Santa Ana</u>, 936 F.2d 1027, 1031 (9th Cir. 1990), the Court stressed that an internal investigation of plaintiffs' complaints uncovered only "isolated incidents of offensive language."[7]

Finally, NEA-Alaska suggests that the three female employees did not subjectively perceive their work environment as abusive because they "confronted Harvey and stood up for themselves." NEA-AK Br. 38 n.10; 49 n.17. There is no basis in law or logic for NEA-Alaska's argument that a woman who complains about abusive behavior cannot subjectively find the work environment abusive. In any event, there is considerable record evidence that the women found the environment abusive, both from their own testimony about feeling intimidated, "distraught," "horrified," and "physically threatened," and from the testimony of male co-workers who observed them "in tears," "very upset," and with a "defeated look." ER570. Finally, the plaintiffs' expert concluded that each of the women experienced psychological harm resulting from Harvey's abusive treatment.   ER588-92.

---

[7] <u>Sanchez</u> concluded that other allegations of a racially discriminatory atmosphere amounted to "a mischaracterization of the record," so as to preclude a hostile environment claim. Id. at 1036.

Accordingly, there is ample evidence, on summary judgment, to conclude that the work environment was subjectively hostile or abusive.

## REPLY TO BRIEF OF NEA[8]

### Statement of Issues

1. Whether NEA is properly named as a defendant where it unlawfully interfered with the opportunity of female employees to work in an environment free of discriminatory harassment and abuse.

2. Whether the procedural prerequisites were satisfied where NEA was aware of the charge, assisted NEA-Alaska in responding to the charge, and knew of its own role in the hostile work environment.

### Statement of Facts

Tom Harvey has had a long relationship with local affiliates of the National Education Association (NEA), working for several affiliates prior to coming to NEA-Alaska. Harvey's relationship with these affiliates has been plagued with many of the same problems that have marked his tenure at NEA-Alaska. For example, Harvey served as Executive Director of the Teachers Association of Baltimore County (TABCO) beginning in 1992. There was evidence that, while at TABCO, Harvey

---

[8] In its brief, NEA raises issues separate and distinct from those raised by NEA-Alaska. Because these issues also involve an entirely different set of facts, the Commission responds separately to NEA.

subjected female employees to abusive behavior. One woman, Carole Jeffries, described one such incident: "[Harvey] came flying in the room . . . and walked directly over to me leaned across me . . . [a]nd he's this close to my nose and he's shaking his finger. And he's screaming at me at the top of his lungs, spewing . . . spit and . . . screaming in my face, if you know what's good for you. . . ." ER405-06. After this incident, Jeffries stated, she felt "[f]rightened because I didn't know what he was capable of." ER409. Jeffries stated that Harvey yelled frequently, and that there were other times when Harvey approached her in the same way, "yelling and screaming . . . and getting very close to me and shaking his finger in my face." ER410. Jeffries added that Harvey did not subject male employees to abusive behavior: "The guys never did anything [to defuse the situation]. They would just kind of sit back and be glad it wasn't them." ER413.

Another female TABCO employee, Linaya Yates-Lea, described similar behavior: Harvey "came over and yelled at me with a finger in my face. . . . He was screaming at me. . . . [He was] [v]ery hostile." ER434. Yates-Lea added that Harvey "raised his voice all the time." ER434-35. The two male TABCO employees were not subjected to yelling or abusive behavior, according to Yates-Lea. ER436. Yates-Lea eventually quit her job at TABCO.

In April 1994, Jeffries filed a grievance through her union complaining about "the hostile work environment [Harvey] created for her." ER427. The grievance

caused NSO – the national union for employees of NEA and its affiliates – to report in its June 1994 newsletter that it had placed sanctions on TABCO "for the actions of manager Tom Harvey." ER440. The newsletter explained that Harvey "has forced through harassment, threats, abusive language, shouting and other modes of intimidation, the resignation of two female UniServ directors." ER440. The purpose of the sanctions, according to Jeffries and Yates-Lea, was to warn other NSO members about seeking employment at TABCO, and to "bring that to the attention of anyone in NEA." ER436.

Jeffries also stated that she complained about Harvey's abusive behavior to three different NEA officials. NEA's Director of Human and Civil Rights, Earl Jones, told Jeffries "it was terrible that he would do it . . . he's probably gotten away with it before and he'll probably get away with it again, maybe you do need to think about leaving." ER423. Jones referred her to the Mid-Atlantic Region Director, Mr. Felix, to discuss alternative employment with NEA. Jeffries told Felix about how Harvey was "angry and yelling at me . . . and . . . being . . . intimidat[ing.]" ER424. She also told another NEA official, Southeast Regional Director Eugene Dryer, that she had filed a grievance complaining about Harvey's "terrible treatment." ER425.

In September 1994, Harvey became executive director of the Mississippi NEA affiliate, known as MAE. At MAE, Harvey was part of an NEA program called the Unified State Executive Director Program (USEDP). Under USEDP, which is

designed to help smaller affiliates with the costs of employing executive directors, NEA pays a portion of the executive director's salary and benefits.  NEA-ER214.  In Mississippi, as well as in Alaska, the portion NEA pays is 30 percent, the maximum under USEDP.  NEA-ER124.  USEDP Guidelines also state that "[t]he USEDP Executive Director shall be an employee of NEA."  NEA-ER216.

Although NEA officials testified that NEA has little involvement with affiliates' employment of executive directors, USEDP Guidelines indicate that NEA has at least the authority to take more than a hands-off approach to their employment. For example, NEA must approve an incumbent executive director's admission into the USEDP.  NEA-ER216.   If an incumbent executive director is not selected, the Guidelines state that "NEA and [the state affiliate] shall jointly develop a list of persons . . .they consider qualified to serve as the USEDP Executive Director . . . . The [state affiliate] shall select from this list the person . . . it wishes to have serve as the USEDP Executive Director."  NEA-ER216.  The Guidelines also state that NEA, the state affiliate, and the individual executive director shall "jointly determine the USEDP Executive Director's starting date and the length of the term of . . . employment."  NEA-ER219.  The Guidelines state that NEA may request that the USEDP Executive Director attend training sessions "designed to improve his or her effectiveness."  NEA-ER220.  The Guidelines require that the state affiliate, "after consulting with the NEA Executive Director," conduct annual performance

17

evaluations of the USEDP Executive Director. NEA-ER220. Finally, the Guidelines discuss termination of the USEDP Executive Director, describing what conduct would justify "for cause" termination and appropriate severance pay. NEA-ER220-21.

In early 1998, MAE decided it no longer wanted Harvey to serve as executive director, notwithstanding the fact that MAE had recently entered into an employment contract with Harvey. According to the MAE Board President, Harvey was routinely abrasive to union members and generally was defensive and hostile in his attitude. CER10. The Board President stated that Harvey was equally abrasive with women and men. But Marius Ambrose, an NSO official who traveled to Mississippi because the staff there was on the verge of a strike, described matters somewhat differently. According to Ambrose, Harvey was "abusive, yelling screaming at them, telling them they're all incompetent and it was all women in that office. . . . They all thought he was . . . an abusive jerk and they were waiting to get rid of him." CER7.

The MAE Board President contacted an NEA official because MAE "wanted to know what their options might be in terms of getting somebody else in there besides Mr. Harvey," as the NEA official put it. ER453. That NEA official – Larry Diebold – traveled to Mississippi to help with matters. In the end, MAE and Harvey entered into a settlement agreement under which he was immediately paid a lump sum amount representing his salary for the third year of his employment contract. ER470.

18

He would also continue to be paid on a regular basis his full salary for years one and two of the employment contract (of which Harvey had already served roughly six months). ER470. The settlement agreement, executed in February 1998, also states that upon his departure from MAE, "Harvey's assignment under the USEDP program will be directed by NEA, but they will no longer include any assignments in the state of Mississippi." ER471. In a separate agreement between NEA and MAE, NEA agreed to pay 30 percent of the "settlement payments" to Harvey and to pay the entire amount of "severance pay for . . .Harvey." ER464. NEA also agreed to "provide an interim Executive Director for MAE," sharing the costs with MAE. ER464.

Within two weeks of leaving Mississippi, Harvey was working as NEA-Alaska's interim Assistant Executive Director. His path there started when Vernon Marshall, NEA-Alaska's Executive Director, called an NEA regional official, Nelson Okino, because he needed to fill the Assistant Executive Director slot on an interim basis. NEA-ER133. Okino in turn called Diebold, who told him about Harvey. Okino then gave Marshall Harvey's name and, apparently, information about NEA's agreement to pay Harvey. NEA-ER143-44. According to Jeff Cloutier, Marshall was eager to get Harvey because Harvey's entire salary was being paid under the MAE agreement – Marshall understood that Harvey was an NEA "staff person under their pay that could come to NEA Alaska." CSER2. This meant that NEA-Alaska "could get something for nothing out of the NEA," as Cloutier put it. CSER2. NEA-Alaska

only paid Harvey a monthly housing stipend of $1,200. NEA-ER136. Marshall did not look into Harvey's employment background or history before agreeing to take him on. ER78.

Notwithstanding the pay arrangement, under which NEA-Alaska paid none of Harvey's salary, Marshall stated that he viewed Harvey as an NEA-Alaska employee who would be "subject to my supervision, . . . and . . . if his performance were a problem, he would . . . be asked to leave, and he would leave." NEA-ER312. However, contemporaneous documents from Marshall referred to Harvey as working "on assignment" for a year; and when Marshall sought to extend Harvey's term beyond a year, he wrote Okino and Diebold that he understood "that my request to exten[d] . . . Harvey's assignment as . . . Interim Assistant Executive Director is appropriate and will be granted." ER477-78. During this time, Harvey and NEA-Alaska had no employment contract; Harvey's contract was the MAE agreement. NEA-ER312. Harvey served as Interim Assistant Executive Director until August 31, 1999, the last effective day of the MAE settlement agreement. Thereafter he was NEA-Alaska's Assistant Executive Director, and NEA-Alaska paid his entire salary.[9] ER449-50.

NEA's actual involvement with Harvey and NEA-Alaska did not cease at that

---

[9] The USEDP applies only to Executive Directors of affiliates, not Assistant Executive Directors. Marshall, as Executive Director, was in the USEDP and had 30 percent of his salary paid by NEA. NEA-ER311.

point, however. In 2000, after the three female employees filed EEOC charges, Marshall telephoned Okino to discuss the charges; Marshall's contemporaneous notes stated that he "[re]viewed" the charges with Okino. ER524-25. More significantly, Marshall also telephoned NEA General Counsel Bob Chanin in the summer of 2000 to set up a conference call to discuss the EEOC charges. ER527. The subsequent conference call involved discussions about the charges with Marshall, Harvey, NEA-Alaska counsel Leslie Longenbaugh, Chanin, and NEA Associate Counsel Maurice Joseph. ER528; ER518. Thereafter, Joseph was kept informed of the progress of the litigation; he was sent a copy of the complaint, and Longenbaugh called him to tell him about the plaintiffs' intent to join NEA as defendant. ER519. Joseph and Longenbaugh had "three or four" discussions about the response to the motion to join NEA. ER519.

The Commission filed suit against NEA-Alaska in July 2001. During the course of discovery, the Commission and intervenors learned what previously had not been made known to them – in particular, information about the USEDP program, about NEA's involvement with Harvey, and its role in bringing Harvey to NEA-Alaska. In June 2002, the Commission and the intervenors accordingly moved to join NEA as a defendant on the grounds that it violated Title VII by assigning to NEA-Alaska a person known to have engaged in unlawful discrimination and harassment in the past and by acting as Harvey's employer while he worked as NEA-Alaska's

Interim Assistant Executive Director.

## ARGUMENT

In its brief, NEA raises procedural and substantive issues, both of which entail a complicated set of facts. The district court addressed neither the legal issues nor the facts relevant to NEA's assertion that it is not a proper defendant. The Commission agrees with NEA that the issues are nevertheless ripe for review by this Court.[10]

**A. NEA is properly named as a defendant because it unlawfully interfered with the opportunity of female employees to work in an environment free of discriminatory harassment and abuse.**

The "interference with employment opportunities" theory applies where a covered entity "discriminated against and interfered with the employees' relationship with their employers." Anderson v. Pac. Mar. Ass'n, 336 F.3d 924, 931 (9th Cir. 2003); see also id. at 932 (liability appropriate where there exists discriminatory interference by indirect employer and indirect employer had some peculiar control over employee's relationship with direct employer); Ass'n of Mexican-Am. Educators (AMAE) v. Calif., 231 F.3d 572 (9th Cir. 2000) (en banc) (plaintiff may sue third party under Title VII); Gomez v. Alexian Bros. Hosp., 698 F.2d 1019 (9th Cir. 1983) (same); but see Anderson, 336 F.3d at 932 (employers' association not liable because

---

[10] This Court may also decline to address the issues NEA raises. Erickson v. U.S., 976 F.2d 1299, 1302 (9th Cir. 1992) ("Because this is a factually intensive issue that the district court did not address, we will not do so here. On remand, the district court . . . may entertain a motion for summary judgment based on this defense.").

association neither caused nor had any real "power to stop the hostile work environment").

The evidence in this case demonstrates that NEA discriminatorily interfered with the charging parties' right to work in an environment free of unlawful discriminatory harassment, and that the circumstances surrounding Harvey's departure from MAE led to the unique, or "peculiar," control NEA exerted over Harvey. Specifically, the evidence indicates that NEA effectively assigned Harvey to NEA-Alaska. When NEA-Alaska approached NEA about an Assistant Executive Director, NEA gave NEA-Alaska a single name – Harvey's – and offered him virtually free of charge to the affiliate. NEA's interest in sending Harvey is unsurprising because, at the time, Harvey was being paid a salary by NEA but was doing no work. Documents refer to NEA as assigning Harvey, and NEA-Alaska sought NEA's permission to keep Harvey on longer than the initially agreed upon term. The individual at NEA-Alaska who agreed to take Harvey on – Marshall – was himself connected to NEA; he was a USEDP Executive Director receiving thirty percent of his salary and benefits from NEA. In short, NEA's actions were not simply those of a disinterested party making an employment referral, but instead were more like those of an employer reassigning a troublesome employee from one location to another.

NEA contends that the Commission would impose liability only by virtue of

23

Harvey's status as a USEDP participant. NEA Br. 30-35. This misstates the Commission's argument. Harvey was not the typical USEDP participant. Ordinarily, a local affiliate pays at least seventy percent of a USEDP participant's salary. In this case, NEA-Alaska paid none of Harvey's salary during the time he was a participant (except for a housing stipend), because of the unique circumstances surrounding Harvey's NEA-negotiated departure from MAE. Contemporaneous documents written by Marshall referring to Harvey as "on assignment" from NEA also support the inference that NEA was acting at least as a joint employer of Harvey during the time the MAE-Harvey settlement agreement was in effect. The language of the settlement agreement further supports this inference. Under the terms of the agreement, the obligation to pay Harvey a salary until August 31, 1999 would cease if "Tom Harvey secures other employment." Harvey continued to be paid under the MAE agreement after beginning to work at NEA-Alaska, indicating that NEA did not view this as new employment, but rather a continuation of his employment with it.[11]

NEA's culpability for the abusive environment Harvey created also is grounded

---

[11] NEA argues that Harvey began harassing employees only after the MAE agreement expired in September 1999 (when NEA ceased paying Harvey's salary). NEA Br. 37. In fact, the evidence indicates that Harvey's abusive behavior began in 1998. For example, Christopher stated that the first incident with Harvey occurred in the Fall of 1998, when he yelled at her loudly and told her she was "fucking up." ER312. She also stated that in January 1999 the staff got together to discuss Harvey's "yelling and berating of staff" and to see whether the union could do anything about it. ER312.

in the fact that NEA chose to supply NEA-Alaska with Harvey, whom NEA officials knew had a history of abusive conduct, particularly towards women. Diebold, for example, was directly involved in helping MAE rid itself of Harvey, and so it can be inferred that he was aware of Harvey's abusive behavior towards the all-female MAE workforce. There was evidence that NEA officials were aware of Harvey's abusive behavior at TABCO, notably Jeffries' testimony that she discussed Harvey with three NEA officials. Furthermore, at the summary judgment stage it is fair to infer that the sanctions the national employees' union very publicly placed on TABCO for a hostile work environment provided further notice to NEA of Harvey's abusive conduct. Diebold nonetheless effectively assigned Harvey to work for NEA-Alaska, apparently without ever mentioning or warning NEA-Alaska of Harvey's past conduct.

NEA's actions thus laid the foundation for the creation of the hostile work environment, and Harvey began his abusive behavior while essentially acting as an NEA employee. Marshall, the NEA-Alaska official with direct hiring and firing authority over Harvey, was himself subject to some degree of control by NEA by virtue of his participation in the USEDP. Given all these factors, there is evidence that NEA played a sufficiently large role in the creation of the hostile work environment to hold it liable for discrimination.

It is true that NEA's role in this case is not identical to that of the defendants in AMAE and Gomez. The Commission readily acknowledges that, unlike cases

25

where the defendant has itself performed the discriminatory acts and where it exerts

complete control over the plaintiff's employment or access to employment, NEA did

not exert exclusive control.  But NEA's role also is not analogous to that of the

employer association in Anderson, where this Court held that the association did not

cause the harassment nor did it have any meaningful ablity to stop it.  336 F.3d at

932.  NEA played a role in causing the hostile work environment by its apparent

attempt to pass off an extremely abusive supervisor on employees in Alaska, and

through its relationship with Harvey and Marshall it possessed a meaningful ability

to stop the abusive behavior.  Accordingly, there are sufficient grounds to hold NEA

liable.

**2. Because NEA was aware of the charge, assisted NEA-Alaska in responding to the charge, and knew of its own role in the hostile work environment, the procedural prerequisites were satisfied.**

Christopher, Bhend, and Chamara all filed charges alleging that Tom Harvey

subjected them to a discriminatory work environment.  The charges list the onset of

the discriminatory conduct as September 1998 in Christopher's charge, and April

1999 in the other two charges. The charges name only NEA-Alaska as respondent.

This latter fact, NEA argues, is "fatal to the claims against NEA." NEA Br. 19.  NEA

is incorrect: under this Court's precedent, the charging parties' failure to recognize

the role NEA played in creating the hostile work environment at the time they filed

their charges is not fatal to the claims against NEA.

As NEA itself acknowledges, a Title VII claim can be brought against parties not named in a charge "'as long as they were involved in the acts giving rise to the . . . claim[].'" <u>Sosa v. Hiraoka</u>, 920 F.2d 1451, 1458-59 (9th Cir. 1990) (quoting <u>Wrighten v. Metro. Hosp.</u>, 726 F.2d 1346, 1352 (9th Cir. 1994)).  Additionally, an unnamed party may be included in a suit where that party "'should have anticipated' that the claimant would name [it] in a Title VII suit." <u>Sosa</u>, 920 F.2d at 1459.

NEA falls within these exceptions.  As discussed above, NEA's role in foisting Harvey on NEA-Alaska and the evidence that NEA-Alaska, which paid none of Harvey's salary until September 1999, viewed Harvey as "on assignment" from NEA during that time meant that NEA was "involved" in the abusive environment created.  Additionally, the fact that NEA's legal staff conducted a telephone conference regarding the EEOC charges and the fact that the charges indicate Harvey's abusive behavior began during the time Harvey was "on assignment" from NEA are evidence that NEA "should have anticipated" it would be named once the Title VII plaintiffs uncovered the evidence of Harvey's relationship with NEA.  NEA therefore was properly joined as a defendant in this action.

NEA makes a second procedural argument: it argues that the Commission's claim against NEA cannot proceed because the Commission did not specifically attempt conciliation with NEA.  There are three basic problems with NEA's

argument. First, as the case on which NEA relies states, what is necessary is that a party be given the *opportunity* to participate in conciliation. Schnellbaecher v. Baskin Clothing, 887 F.2d 124, 126 (7th Cir. 1989). Unlike EEOC v. Pierce Packing, 669 F.2d 605 (9th Cir. 1982), where there was no conciliation at all, there was conciliation here. At the time, NEA knew of the EEOC charges, and it knew of its relationship with Harvey – the EEOC did not. NEA never sought involvement in the conciliation. Responsibility for its absence from conciliation thus should lie with NEA. The second problem with NEA's argument is that if this Court were to hold that the Commission should have conciliated with NEA, the proper remedy would not be to dismiss the action against NEA, but instead to stay proceedings while conciliation occurs. See 42 U.S.C. § 2000e-5(f)(1) (court may stay proceedings for up to 60 days to further efforts to obtain voluntary compliance); EEOC v. Pet, Inc., 612 F.2d 1001, 1002 (5th Cir. 1980) (court should have ordered stay); EEOC v. Zia Co., 582 F.2d 527, 533 (10th Cir. 1978) (if court does not entertain claim it should "stay the proceedings for further conciliation efforts"); EEOC v. First Midwest Bank, 14 F.Supp.2d 1028, 1031 (N.D. Ill. 1998) ("appropriate remedy" for improper conciliation "is not dismissal, but a stay of the proceedings. . ."). Finally, if this Court were inclined to dismiss the Commission's claim against NEA, NEA would still remain a party because the plaintiffs/intervenors are not subject to the statutory conciliation requirement that binds the Commission. See 42 U.S.C. § 2000e-5(f)(1).

## CONCLUSION

We urge this Court to reverse the district court judgment and remand the case for further proceedings.

Respectfully submitted,

ERIC S. DREIBAND
General Counsel

LORRAINE C. DAVIS
Acting Associate General Counsel

CAROLYN L. WHEELER
Assistant General Counsel

JENNIFER S. GOLDSTEIN
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that the attached opening brief is proportionally spaced, has a typeface of 14 points, and contains 6,999 words.

Jennifer S. Goldstein

29

## CERTIFICATE OF SERVICE

I hereby certify that two copies of this brief were mailed, first class, postage prepaid, on this 17th day of December, 2004, to the following:

> Kenneth R. Friedman
> Friedman, Rubin & White
> 1126 Highland Avenue
> Bremerton, WA 98337
>
> Terry A. Venneberg
> 625 Commerce Street, Suite 460
> Tacoma, WA 98402
>
> Leslie Longenbaugh
> Simpson, Tillinghast, Sorensen &
>    Longenbaugh
> One Sealaska Plaza, Suite 300
> Juneau, AK  99801
>
> Jeremiah Collins
> Bredhoff & Kaiser, P.L.L.C.
> 805 Fifteenth Street, N.W.
> Washington, DC 20005

> JENNIFER S. GOLDSTEIN
> Attorney
>
> EQUAL EMPLOYMENT
>    OPPORTUNITY COMMISSION
> Office of General Counsel
> 1801 L Street, N.W.
> Washington, DC 20507
> (202) 663-4733

December 17, 2004