No. 04-35029 & 04-35201

---

# IN THE UNITED STATES COURT OF APPEAL
# FOR THE NINTH CIRCUIT

---

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Plaintiff-Appellants

and

CAROL CHRISTOPHER, JULIE BHEND and CARMELA CHAMARA

Plaintiff-Intervenors-Appellants

v.

NATIONAL EDUCATION ASSOCIATION-ALASKA and NATIONAL
EDUCATION ASSOCIATION

Defendants-Appellees

---

On Appeal From the United States District Court
For the District of Alaska, No. A01-0225-CV (JKS)

---

## REPLY BRIEF FOR THE PLAINTIFF-INTERVENORS-APPELLANTS

---

Kenneth R. Friedman          Terry A. Venneberg
Friedman, Rubin & White      Attorney at Law
1126 Highland Avenue         625 Commerce Street, Suite 460
Bremerton, WA  98337         Tacoma, WA  98402
360-782-4300                 253-572-3467

Counsel for Plaintiff-Intervenors-Appellants

December 15, 2004

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS...................................................................i

TABLE OF AUTHORITIES.........................................................iii

A.    SUMMARY JUDGMENT ON THE "BECAUSE OF SEX"
      REQUIREMENT WAS INAPPROPRIATE, GIVEN
      EVIDENCE OF DISPARATE TREATMENT OF WOMEN
      AT NEA-ALASKA, AND PAST ABUSIVE BEHAVIOR
      TOWARDS WOMEN BY HARVEY IN HIS PREVIOUS
      EMPLOYMENT....................................................................1

B.    SUMMARY JUDGMENT ON THE "SEVERE OR
      PERVASIVE" ELEMENT OF PLAINTIFFS' CLAIMS
      WOULD NOT HAVE BEEN APPROPRIATE.........................9

C.    NEA IS NOT ENTITLED TO SUMMARY JUDGMENT
      ON THE CLAIMS WHICH HAVE BEEN BROUGHT
      AGAINST IT......................................................................13

      1.    Facts Applicable to Plaintiffs' "Interference with
            Employment Opportunities Claim" against NEA.................14

            a.    Harvey's NEA employment history, and NEA's
                  role in assigning him to Alaska...........................14

            b.    NEA's control over Harvey as a participant in the
                  USEDP Program..............................................18

      2.    Plaintiffs have offered evidence that NEA interfered
            with their employment opportunities by assigning
            Harvey to its Alaska Affiliate....................................21

D.    CONCLUSION..................................................................29

LETTER REGARDING EXTENSION OF TIME

STATUTES CITED

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Anderson v. Pacific Maritime Assn.,*
336 F.3d 924 (9th Cir. 2003).................................................................23, 27-29

*Association of Mexican-American Educators v. California,*
231 F.2d 572 (9th Cir. 2000)................................................................22, 26-28

*Becker v. ARCO Chem. Co.,*
207 F.3d 176, 194 n. 8 (3rd Cir. 2000)..............................................6

*Brooks v. City of San Mateo,*
229 F.3d 917 (9th Cir. 2000)...... ...................................................11

*Burks v. Oklahoma Pub. Co.,*
81 F.3d 975 (10th Cir. 1996)... ........................................................6

*Davis v. Coastal International,*
275 F.3d 1119 (D.C. Cir. 2002)............. ...........................................8

*Desert Palace, Inc. v. Costa,*
539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)...........................5

*E.E.O.C. v. Hacienda Hotel,*
881 F.2d 1504 (9th Cir. 1989)......... ............................................26

*Ellison v. Brady,*
924 F.2d 872 (9th Cir. 1991)......... .............................................10

*Gallo v. Prudential Residential Services,*
22 F.3d 1219 (2nd Cir. 1994)...... ...........................................5-6

*Gomez v. Alexian Brothers Hospital,*
698 F.2d 1019 (9th Cir. 1983)... .............................................22

*Hardin v. C. Johnson & Son, Inc.,*
167 F.3d 340 (7th Cir. 1999) cert. den. 528 U.S. 874 ......................8

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ..................9, 12-13

*Hartsell v. Duplex Products,*
123 F.3d 766 (4th Cir. 1997).............. .........................................8

*Heyne v. Caruso,*
69 F.3d 1475 (9th Cir. 1995).......................................................7

*Joens v. John Morrell & Co.,*
354 F.3d 938 (8th Cir. 2004)................... .................................7-8

*Kortan v. California Youth Authority,*
217 F.3d 1104 (9th Cir. 2000)... ..............................................11

*Lutcher v. Musicians Union Local 47,*
633 F.2d 880 n.3 (9th Cir. 1980)...............................................21, 29

*McGinest v. GTE Service Corp.,*
360 F.3d 1103 (9th Cir. 2004)....................................................2

*Meritor Sav. Bank, FSB v. Vinson,*
477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)................ ......9, 13

*Nichols v. Azteca Rest. Enter.,*
256 F.3d 864 (9th Cir. 2001)...... ...........................................9, 11

*Oncale v. Sundowner Offshore Servs., Inc.,*
523 U.S. 75 S.Ct. 998, 140 L.Ed.2d 201 (1998) ...........................1, 4, 8

*Palesch v. Missouri Commission,*
233 F.3d 560 (8th Cir. 2000)...... .........................................8

*Raad v. Fairbanks North Star Borough School District,*
323 F.3d 1185 (9th Cir. 2003)...... ............................................2

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. 133 S.Ct. 2097, 147 L.Ed.2d 105 (2005).............................4

*Rogers v. Missouri Pacific R. Co.,*
352 U.S. 500 n. 17, 77 S.CT. 443, 1 L.Ed.2d 493 (1957)… ………………..5

*Sanchez v. City of Santa Ana,*
936 F.2d 1027 (9th Cir. 1990)…… …………………………………………..11

*Sibley Memorial Hospital v. Wilson,*
488 F.2d 1338 (D.C. Cir. 1973) …………………………………..21-22, 25-29

*Southard v. Texas Board,*
114 F.3d 539 (5th Cir. 1997)……………………………………………….8

*Steiner v. Showboat Operating Co.,*
25 F.3d 1459 (9th Cir. 1994)……………………………………………….9

*Vasquez v. County of Los Angeles,*
349 F.3d 634 (9th Cir. 2004)……………………………………………..11

*Watson v. Gulf & W. Indus.,*
650 F.2d 990 (9th Cir. 1981)………………………………………….23, 28

**STATUTES**

42 U.S.C. § 2000e-2(a)…………………………………………………..21

A.  SUMMARY JUDGMENT ON THE "BECAUSE OF SEX" REQUIREMENT WAS INAPPROPRIATE, GIVEN EVIDENCE OF DISPARATE TREATMENT OF WOMEN AT NEA-ALASKA, AND PAST ABUSIVE BEHAVIOR TOWARDS WOMEN BY HARVEY IN HIS PREVIOUS EMPLOYMENT

NEA-Alaska argues that the record presented to the District Court, and now to this Court, is devoid of any evidence that the actions of Tom Harvey were directed against the intervenors because of their gender.  The argument offered by NEA-Alaska, however, turns on its *interpretation* of evidence before the court, rather than its *existence*.  NEA-Alaska has asked that this court review the evidence that has been submitted, and make determinations from that evidence as to whether plaintiffs have proven gender-based discrimination.  Such an approach is entirely inappropriate in deciding whether *summary judgment* was a proper resolution of plaintiffs' claims.  The question to be resolved by this court is whether it may be inferred from the evidence submitted that the female employees of NEA-Alaska who have brought these claims were "exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed."  *See, Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).  The ultimate question of whether there was gender-based discrimination at NEA-Alaska is one to be determined by a jury, after a full consideration of the evidence at trial.

This Court has consistently recognized that summary judgment in

1

employment discrimination cases is only to be granted under the rarest of circumstances. "In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (citations omitted).

This Court has also recognized the inappropriateness of a District Court making determinations concerning the quality and weight of the evidence in deciding summary judgment motions. *See, Raad v. Fairbanks North Star Borough School District*, 323 F.3d 1185, 1194 (9th Cir. 2003) (Reversing summary judgment in favor of the employer, noting that the District Court had "failed to draw all reasonable inferences in favor of Raad, the nonmoving party, and impermissibly substituted its judgment concerning the weight of the evidence for the jury's.")

The District Court in the present case disregarded these important principles in granting summary judgment in favor of the NEA defendants. No "full airing of the evidence" was allowed. There was no "opportunity to evaluate the credibility of the witnesses." The District Court "failed to draw all reasonable inferences in favor" of the plaintiff employees, and "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." The most egregious

2

example of the latter is the finding by the District Court "that Harvey yelled at men as well as women." ER 611. This conclusion simply fails to acknowledge evidence of the wide disparity in treatment of females and males in the NEA-Alaska workplace, and constitutes a clearly inappropriate judgment "concerning the weight of the evidence" by the District Court.

The record in this case unquestionably contains evidence that the female employees of NEA-Alaska endured conditions worse than those faced by the male employees. Tom Harvey repeatedly engaged in "screaming," "yelling," and physically threatening conduct towards the female employees who brought these claims. Loud swearing, false accusations, spying, banging on tables and windows, and other abusive and intimidating behavior were also directed at the plaintiff female employees.

By any fair reading of the evidence, *and certainly when all reasonable inferences are drawn in favor of plaintiffs*, the male employees at NEA-Alaska were not exposed to such conditions. The record contains references to no more than a few instances where Tom Harvey even raised his voice *at all* to male employees. NEA-Alaska employee Jeff Cloutier described a single incident with Harvey that left him "shaky" and "trembling," *See, NEA-Alaska Brief, p. 28*; however, it was also Mr. Cloutier who testified that he personally heard Harvey raise his voice or yell at Carol Christopher "easily a dozen" times, ER 340, and

3

described Harvey's anger, hollering and similar behavior as the "general fear of the women at our office." ER 573. Again, drawing all inferences in favor of the plaintiffs, the evidence indicates that the women at NEA-Alaska suffered "disadvantageous terms or conditions" compared to those encountered by men.

The heart of NEA-Alaska's argument is that summary judgment was appropriate because plaintiffs failed to offer direct evidence of sex discrimination by Harvey. "But there is also no dispute with respect to the following fact: Harvey's alleged words and conduct were ***devoid of any sexually explicit or implicit*** language, stereotyping, innuendo, or animus that could raise an inference of discrimination." *NEA-Alaska's Brief, pp. 37-38.* (Emphasis added) This contention is directly contrary to two overriding principles in the law to be applied to plaintiffs' claims.

First, as recognized in *Oncale*, the conduct at issue does not have to be "sexually explicit or implicit" in order to constitute illegal discrimination "because of sex"; the "critical issue" is "whether members of one sex are exposed to disadvantageous terms or conditions to which members of the other sex are not exposed." 523 U.S. at 80. Discrimination may be shown by offering "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 81. Second, as has been noted by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120

S.Ct. 2097, 147 L.Ed.2d 105 (2000), and again recently in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), discrimination may be proved by circumstantial evidence; direct evidence of discrimination is not required, and in fact is usually unavailable in most cases. "We have often acknowledged the utility of circumstantial evidence in discrimination cases." *Costa*, 123 S.Ct. at 2154. "The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be certain, satisfying and persuasive than direct evidence.'" *Id., quoting Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

Under the approach urged by NEA-Alaska, the intervenors could not have survived summary judgment unless they produced some statement, comment or indication by Tom Harvey that he was engaging in abusive conduct towards them because they were female. That approach is simply inconsistent with the law to be applied to plaintiffs' claims, and for good reason. Those engaged in discrimination are extraordinarily unlikely to announce, either directly or indirectly, their intent to discriminate. In *Gallo v. Prudential Residential Services*, 22 F.3d 1219 (2nd Cir. 1994), the Court noted this concern in reviewing the requirements for granting summary judgment motions in employment discrimination cases, stating as follows:

5

> [W]hen deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. ... Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

22 F.3d at 1224 (citations omitted).

In this case, plaintiffs have offered significant circumstantial evidence that Tom Harvey engaged in his harassment of the intervenors "because of sex." As described in exhaustive detail in previous briefing, Harvey treated the women in the NEA-Alaska workplace - and particularly these plaintiff employees - more harshly than he did the men.

In addition, plaintiffs have offered evidence that Harvey had previously engaged in harassment and abusive behavior towards women in his earlier employment with an NEA affiliate in Maryland. *See, infra, pp. 14-16.* "[A]s a general rule, evidence of a defendant's prior discriminatory treatment of a plaintiff *or other employees* is relevant and admissible to establish whether a defendant's employment action against an employee was motivated by invidious discrimination." *Becker v. ARCO Chem. Co.,* 207 F.3d 176, 194 n. 8 (3rd Cir. 2000) (Emphasis added); *See also, Burks v. Oklahoma Pub. Co.,* 81 F.3d 975, 981

(10th Cir. 1996). This Court has emphasized that the probative value of evidence that a defendant also treated similarly situated employees unlawfully is "'especially high' because of the inherent difficulty in proving state of mind." *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995).[1]

While NEA-Alaska - as well as the District Court - chose to ignore evidence of Harvey's previous misconduct towards women, this Court should give recognition to the importance of that evidence to plaintiffs' claims. As noted, this Court has recognized the "inherent difficulty" associated with proving discrimination. Past abusive behavior towards the same protected class - women - in the same setting - as head of an NEA affiliate organization - is highly illustrative of Harvey's intent while employed at NEA-Alaska.

The cases cited by NEA-Alaska on the "because of sex" requirement are all factually dissimilar to the present case in that, in each case, there was found to be no evidence of disparate treatment between the sexes or races. In *Joens v. John Morrell & Co.*, 354 F.3d 938, 941 (8th Cir. 2004), the Court noted, in response to

---

[1] The evidence of Harvey's previous conduct toward female employees in his NEA-related employment is particularly probative here, given the almost identical nature of the behavior - screaming and yelling of epithets "at the top of his lungs," physically threatening conduct, and other similar actions - to the conduct at issue in this case. Again, there is no evidence that Harvey engaged in this type of behavior against male employees in his previous NEA-related employment.

the plaintiff's claim that "the men who made box tops on the night shift were not subjected to comparable criticism," that there was "no evidence that (her supervisor) ever worked the night shift, so this testimony does not show that he treated Joens differently because of her sex." In *Hardin v. C. Johnson & Son, Inc.*, 167 F.3d 340, 346 (7th Cir. 1999), cert. den. 528 U.S. 874, the Court noted no evidence that any race or sex was treated any differently in the workplace. In *Davis v. Coastal International*, 275 F.3d 1119, 1124 (D.C. Cir. 2002), the Court found that the plaintiff had not offered evidence that the offending co-workers had "treated ***men*** differently than women..." (Emphasis supplied) *Hartsell v. Duplex Products*, 123 F.3d 766 (4th Cir. 1997), was a case decided prior to *Oncale*, and did not even address whether the sexes had been treated differently. In *Southard v. Texas Board*, 114 F.3d 539, 555 (5th Cir. 1997), also decided before *Oncale*, the Court noted that the supervisor's "door slamming and stares were directed toward men as well as women." Finally, in *Palesch v. Missouri Commission*, 233 F.3d 560, 567 (8th Cir. 2000), the Court acknowledged, in discussing the hostile work environment claim, that the plaintiff had "admitted to non-discriminatory explanations for her co-workers' behavior..." None of these cases involved significant evidence of disparate treatment of women and men in the workplace, as was offered in the present case.

In light of evidence indicating disparate treatment of women at NEA-Alaska,

as well as evidence of previous abusive conduct by Harvey towards women in the workplace, summary judgment on the "because of sex" requirement was inappropriate, and should be reversed.

## B.  SUMMARY JUDGMENT ON THE "SEVERE OR PERVASIVE" ELEMENT OF PLAINTIFFS' CLAIMS WOULD NOT HAVE BEEN APPROPRIATE.

In determining if an environment is so hostile as to violate Title VII, it is considered whether, in light of "all the circumstances," *Nichols v. Azteca Rest. Enter.*, 256 F.3d 864, 872 (9th Cir. 2001), the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  The Supreme Court has followed a "middle path" with regard to the level of hostility or abuse necessary to establish a hostile work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII. *Id.* However, the harassment need not cause diagnosed psychological injury. *Id.* at 22, 114 S.Ct. 367.  It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).

9

The record before this Court certainly reflects a workplace "polluted" by the abuse engaged in by Tom Harvey. The record reflects that each plaintiff employee was "yelled" and "screamed" at by Harvey at NEA-Alaska on multiple occasions. On several occasions, Harvey "lunged" at each of the plaintiff employees during their encounters. Harvey pointed his finger at these employees at close range, violating their sense of personal space and safety. In the case of Carol Christopher, Harvey had as many as a dozen of these types of encounters with her - yelling so it could be heard outside of the room, hovering over her in a threatening manner, acting in a manner so abusive and extreme that it caused Christopher, on numerous occasions, to breakdown crying. In the case of both Bhend and Chamara, they were also yelled at, and had their personal space and safety threatened by Harvey in encounters with him. These events occurred on multiple occasions, and the fear of those events, as testified to by Chamara, was a constant part of the workplace environment at NEA-Alaska.

The impact of the conduct is magnified by plaintiffs' status as women. "Conduct that many men consider unobjectionable may offend many women." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) (Objective hostility of the workplace evaluated from the perspective of a reasonable woman.) In this record, there is no evidence of any man being upset to the point of tears over any encounter with Harvey; there is evidence that women on numerous occasions were

10

driven to tears by Harvey's violent outbursts.[2]  The then-staff union president, Jeff Cloutier, has testified to the "fear" that he saw expressed by women in the NEA-Alaska workplace over Harvey's conduct.  ER 573.  The women who have brought this case have all testified to the fear and upset that they experienced as a result of their encounters with Harvey.  The testimony and evidence illustrates a work environment that was both subjectively and objectively hostile.  *Nichols*, 256 F.3d at 871-72.

The Ninth Circuit cases that NEA-Alaska argues are supportive of their position are not factually similar to the present case.  *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2004), involved several racially-insensitive remarks over a one-year period.  *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000), involved a single episode of inappropriate touching.  In *Kortan v. California Youth Authority*, 217 F.3d 1104, 1110 (9th Cir. 2000), the court noted that the offensive remarks in question had been made "in a flurry" on one day.  In *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990), it was noted that a jury trial was not even

---

[2]  NEA-Alaska rather oddly contends that, "The fact that ... there is no evidence that any man cried or left work does not mean that these reactions did not occur."  *NEA-Alaska's Brief, p. 37, fn. 8.*  One would suspect that, if there had been such reactions, defense counsel would have elicited that evidence at some point during the extensive discovery undertaken.  Clearly, for purposes of determining whether summary judgment is appropriate, the absence of such evidence *does mean* that those types of reactions did not occur.

11

*available* on the Title VII claims raised. "Accordingly, even if plaintiffs' discriminatory atmosphere claim is meritorious, we may not remand it for a jury determination." *Id.* at 1037. None of these situations are even remotely comparable to the situation faced by the women in the case, who were exposed on repeated occasions to violent and threatening outbursts from Tom Harvey.

In *Harris*, the Supreme Court held that a work environment may be found to be hostile or abusive under Title VII even in the absence of psychological injury. 114 S.Ct. at 371. In this case, there is evidence that the environment at NEA-Alaska was so abusive that it did cause the plaintiff employees to suffer severe psychological injury. Dr. Louise Fitzgerald, who was retained as plaintiffs' psychological expert, concluded in her expert report both that these women "are suffering from severe emotional distress and diagnosable psychological disorders," and that "the actions of Thomas Harvey, Executive Director of NEA-Alaska, as it is laid out in the documents and testimony in this litigation" would have been "completely capable of giving rise to such distress and disorder." ER 592.[3] Ms.

---

[3] The findings by Dr. Fitzgerald are illustrative of why summary judgment on the "hostility" issue is inappropriate. "Screaming" and "yelling," when appearing in legal briefs and documentary evidence, are just words on paper, subject to being given a somewhat benign meaning. As Dr. Fitzgerald points out, however, "screaming" and "yelling" constitute extremely serious and psychologically injurious conduct, particularly in a workplace setting, and particularly when directed by a male supervisor against female subordinates.

Christopher was diagnosed by Dr. Fitzgerald as having Post-Traumatic Stress Disorder and Major Depressive Disorder; Ms. Bhend and Ms. Chamara were both diagnosed with Major Depressive Disorder, among other conditions. ER 588-591. Viewing the facts and drawing the inferences in favor of plaintiffs, Bhend, Chamara and Christopher all encountered an environment at NEA-Alaska which caused them serious psychological injury, which *Harris specifically* does not even require in order for a work environment to be found actionably hostile. NEA-Alaska's argument that the conduct at issue was not "sufficient severe or pervasive" to create a hostile or abusive work environment simply ignores this evidence. The environment faced by Bhend, Chamara and Christopher went well beyond the standards set out in *Harris, Meritor*, and their progeny for determining when a hostile work environment may be found to exist.

## C.  NEA IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS WHICH HAVE BEEN BROUGHT AGAINST IT.

Defendant National Education Association ("NEA") has asked this court to affirm summary judgment in its favor, on grounds not addressed by the District Court in its summary judgment ruling. NEA argues that the Title VII claims against it should be dismissed on two grounds: 1) That the statutory prerequisites to an action under Title VII were not satisfied; and 2) that, as a matter of law, NEA did not unlawfully interfere with intervenors' employment opportunities by

13

assigning Tom Harvey to work in its Alaska affiliate.  The following briefing will focus on the latter claim.

1.  Facts Applicable to Plaintiffs' "Interference with Employment Opportunties Claim" against NEA

a.  Harvey's NEA employment history, and NEA's role in assigning him to Alaska

As noted by NEA, Harvey began his work with NEA state affiliate organizations in Maine in the mid-1980's.  NEA-ER 14.  After working in Maine, and in Texas from 1986 to 1992, Harvey was hired by the Teachers Association of Baltimore County ("TABCO") as its Executive Director.  *Id.*  While at TABCO, Harvey supervised several female employees, including Carole Jeffries and Linaya Yates-Lea.  The record is replete with evidence that Harvey engaged in serious verbal harassment and abuse of Jeffries and Yates-Lea, during the time that they served as subordinates to Harvey.  ER 399-426, 433-436.  The record also reflects that Jeffries filed a grievance against Harvey concerning his abusive behavior, ER 427-428, and that the national union for NEA and NEA-affiliated employees ("NSO") issued a warning concerning Harvey to its members.

**TABCO Employees Forced Out**

NSO placed sanctions on the Teachers Association of Baltimore Co. (TABCO) for the actions of manager Tom Harvey. "He has forced through harssment [sic], threats, abusive language, shouting and other modes of intimation [sic] the resignation of two female UniServ directors.

14

ER 440.  This newsletter was distributed to the entirety of the NSO membership

nationwide, which consisted in 1994 of approximately 4,370 NEA state affiliate

employees.  ER 417.

Harvey's penchant for engaging in extreme and abusive behavior towards

women in work-related activities also was publicized concerning an incident

involving a female executive of a nurses union in Baltimore.  During that incident,

Harvey physically assaulted the female executive, and was criminally charged for

his actions.  ER 441-444.

High-ranking NEA officials were informed by Jeffries of the abusive

behavior that she had encountered while supervised by Harvey.  Jeffries spoke

about Harvey to Earl Jones, who was then Director of Human and Civil Rights for

NEA; Leon Felix, then-Director of the Mid-Atlantic Region for NEA; and Eugene

Dryer, who was then Director of the Southeast Region for NEA.  ER 419-426.

Jeffries provided detailed explanations to Jones and Dryer concerning Harvey's

conduct.   In addition to telling Jones that she believed that she was being

discriminated against because she was a woman, Jeffries explained in detail to

Jones what was happening to her in her workplace.  *Id.*  Jones told her that "it was

terrible that he would do it and he said that, you know, he's probably gotten away

with it before and he'll probably get away with it again, maybe you do need to

15

think about leaving." ER 423. She related to Dryer that it was the "terrible treatment" of her by Harvey that caused her difficulty at TABCO. ER 425.

Despite the pattern exhibited by Harvey of abusive behavior against women, Harvey was retained by NEA to participate in the Unified State Executive Director Program ("USEDP"). ER 447. He became employed by NEA on September 1, 1994. *Id.* He remained an employee of NEA from that date until August 31, 1999. ER 449-450. Harvey's first position while in the USEDP was as the Executive Director of the Mississippi Association of Educators ("MAE"). Harvey served as MAE Executive Director from 1994 until his dismissal in 1998. Following Harvey's dismissal by the MAE Board of Directors, NEA made arrangements to pay a substantial portion of Harvey's severance package, ER 464, and also was involved in the preparation of the terms of settlement and release between MAE and Harvey. ER 465-474. One of the terms of settlement between MAE and Harvey, which NEA knew was included in the agreement, was as follows:

> Upon his departure from MAE, Tom Harvey's assignments under the USEDP Program *will be directed by NEA*, but they will no longer include any assignments in the state of Mississippi.

ER 471. (Emphasis added)

Pursuant to this provision of the settlement agreement between Harvey and the NEA Mississippi affiliate, NEA proceeded to find another position for Harvey

16

in the USEDP Program.  Larry Diebold, then-Special Assistant to the Executive Director, testified that he discussed the availability of Harvey with Vernon Marshall, who was then Executive Director of NEA-Alaska.  "And he (Marshall) wanted to know if he could get Harvey up there on some kind of a short-term basis to fill in for one of his managers."  ER 455.  Diebold testified that he told Marshall that, "Yeah, he (Harvey) could be available."  ER 456.  Harvey was going to continue on the NEA payroll after going to Alaska, "as long as the agreement with Mississippi was still in place."  ER 457.

In an e-mail from Harvey to Diebold titled "NEA-Alaska Assignment," Harvey indicated his understanding concerning his placement in Alaska.  He suggested the following message be sent by NEA in order to confirm his "employment with NEA."

> Your duties as an employee under USEDP from 3/1/98 to 8/31/99 include serving as the Interim Assistant Executive Director for NEA-Alaska.  You will be located in Anchorage at least through 12/31/98.  Your annual salary will be $79,090 plus a $1200 per month housing allowance.  You will receive a step increase in accordance with the management schedule effective 9/1/98.

ER 476.

In other messages sent between the parties concerning Harvey's work as Interim Assistant Executive Director at NEA-Alaska, his placement there was

17

characterized as an "assignment." ER 477-478. NEA has testified, in its Rule 30(b)(6) deposition, that Harvey was an employee of NEA until August 31, 1999, eighteen months after he went to work at NEA-Alaska. ER 449-450. Diebold has testified that, after Harvey was assigned to Alaska, he continued on the NEA payroll. ER 457. While in Alaska on assignment, Harvey completed NEA timesheets, and sent those to the NEA Pacific Region Office. ER 479-516.

b. NEA's control over Harvey as a participant in the USEDP program

The National Education Association Guidelines for the Unified State Executive Director Program illustrate that NEA reserved authority over the hiring, supervision, direction, evaluation, discipline and termination of participants in the USEDP, which included Tom Harvey from September 1, 1994, through his assignment by NEA to a management position at NEA-Alaska in February 1998, until August 31, 1999.[4]

*  Under the guidelines, NEA has reserved authority over the selection of Executive Directors in the USEDP.

---

[4] As previously noted, the severance agreement between Harvey and the NEA Mississippi affiliate specifically provided, consistent with the USEDP Guidelines, that "Tom Harvey's assignments *will be directed by NEA*, but they will no longer include any assignments in the state of Mississippi." ER 471. (Emphasis added)

If the SA (State Association) wishes to have its incumbent executive director serve as the USEDP Executive Director, the SA shall so inform NEA. *If NEA gives its approval*, the SA's incumbent executive director shall be selected to serve as the USEDP Executive Director.

If an incumbent executive director is not selected to serve as the USEDP Executive Director, *NEA and the SA shall jointly develop a list of persons that they consider qualified to serve as the USEDP Executive Director.* ... The SA shall select from this list the person that it wishes to have serve as the USEDP Executive Director.

NEA-ER 216. (Emphasis added)

* The guidelines provide that, "The USEDP Executive Director shall be an employee of the NEA..." *Id.* The guidelines also state that, "NEA shall pay the USEDP Executive Director his or her salary in installments in accordance with NEA's regular payroll practices," and go on to require certain minimum and maximum levels of salary to be paid to USEDP Executive Directors, as well as benefits to be provided. NEA-ER 216-217.

* The guidelines call for "NEA, the SA and the person selected to serve as USEDP Executive Director" to "jointly determine the USEDP Executive Director's starting date *and the length of the term of his or her employment...*" ER 219. (Emphasis added)

* The guidelines provide that, "At the request of NEA, the USEDP

Executive Director shall attend a reasonable number of training sessions, workshops, and/or other meetings designed to improve his or her effectiveness as the USEDP Executive Director..." NEA-ER 220.

* A procedure for the evaluation of USEDP Executive Directors is required under the guidelines.

> The SA, *after consulting with the NEA Executive Director*, shall institute a procedure for evaluating the performance of the USEDP Executive Director. The specific nature of the evaluation procedure shall be determined by the SA, *provided that the SA, in consultation with the NEA Executive Director, shall evaluate the USEDP Executive Director's performance in writing at least annually.*

*Id.* (Emphasis added)

* The guidelines provide detailed rules concerning the circumstances under which USEDP Executive Directors may be terminated. NEA-ER 220-223. Provisions concerning appropriate severance pay in the event of voluntary termination, conduct justifying termination for "cause," and inability of a USEDP Executive Director to perform his or duties are included. *Id.*

* The guidelines provide "minimum" standards for agreements between state associations and the USEDP Executive Directors, including requiring that all such agreements provide, among other terms, that, "The USEDP Executive Director is an employee of NEA under the USEDP..." NEA-ER 223.

**2.  Plaintiffs have offered evidence that NEA interfered with their employment opportunities by assigning Harvey to its Alaska affiliate.**

Title VII,

§ 2000e-2(a), which prohibits unlawful employment discrimination, has been interpreted to encompass situations in which "a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 n. 3 (9th Cir. 1980).

The "interference with employment opportunities" claim under Title VII was first articulated in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973).  In that case, the D.C. Circuit held that Title VII would apply to the actions of the defendant hospital, even though the hospital was not the direct employer of the plaintiff employee.  "To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited." *Id.* at 1341.

This Court first addressed the issue of indirect employer liability under *Sibley* in *Lutcher*, where the court noted that for Title VII to apply, "there must be

21

some connection with an employment relationship," though the "connection ...

need not necessarily be direct." *Id.* at 883. Citing *Sibley*, this Court explained that

"[t]his might occur where a defendant subject to Title VII interferes with an

individual's employment opportunities with another employer." *Id.*, at n. 3. In

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983), this Court

again applied the reasoning of *Sibley*, holding that the defendant hospital could be

held liable under Title VII for its discriminatory treatment of the plaintiff,

notwithstanding the fact that the plaintiff was employed by a third party, if the

defendant had interfered with the plaintiff's employment by that third party.

In *Association of Mexican-American Educators v. California*, 231 F.2d 572

(9th Cir. 2000) (*"AMAE"*), this Court again held a third party could be held liable

for discrimination under Title VII. In that case, the plaintiffs were a class of

Mexican-American, Asian-American, and African American prospective and

current teachers who challenged California's use of a skills test – which was a

prerequisite to employment in the state's public schools – under Title VII. *Id.* at

577. The plaintiffs alleged that the test had a disparate impact on minorities. *Id.* at

578.

This Court *en banc* held that Title VII covered the plaintiffs' claims,

agreeing with the district court that the allegedly racially discriminatory test

"interfered" with the plaintiffs' relationship with their future employers, the school

districts. "Our conclusion is dictated by the peculiar degree of control that the

State of California exercises over local school districts." *Id.* at 581. "Against that

background of 'plenary' state control, we have no difficulty concluding that the

State of California is in a theoretical *and* practical position to 'interfere' with the

employment decisions of local school districts." *Id.* at 582 (Emphasis supplied).

The court likened the relationship between the State of California and the local

school districts to the relationship between a corporate parent and its wholly owned

subsidiaries. In analyzing that relationship, this Court stated as follows:

> 'In the absence of special circumstances, a parent corporation is not
> liable for the Title VII violations of its wholly owned subsidiary.'
> *Watson v. Gulf & W. Indus.*, 650 F.2d 990, 993 (9th Cir. 1981). In
> *Watson*, this court held that the parent corporation was not subject to
> Title VII because the case presented no 'special circumstances.' *Id.*
> But the court went on to explain that, '[i]f there was any evidence that
> [the parent] participated in or influenced the employment policies of
> [the subsidiary], ... then we would be presented with a very different
> case." *Id.* Ours in that 'very different case.' The 'parent' state has
> participated extensively in, and influenced, the employment policies
> and practices of the 'subsidiary' local school districts; therefore, the
> state is covered by Title VII.

*Id.*

The recent decision of this Court in *Anderson v. Pacific Maritime Assn.*, 336

F.3d 924 (9th Cir. 2003), further clarified the standard to be applied in determining

whether a third party may be held liable for "interference" with an employment

23

relationship under Title VII.   In that case, longshoremen employed by various companies brought an action against an association of those employers, the Pacific Maritime Association ("PMA"), which negotiated the Collective Bargaining Agreement under which the longshoremen worked.   The court noted that the association had no control or influence over the conditions of the workplaces in which the longshoremen were employed.

> Under the CBA, the member-employers and their walking bosses and foremen – but not PMA – have the responsibility to 'supervise, place or discharge men and to direct the work and activities of longshoremen on the job in a safe, efficient and proper manner.'  The member-employers – but not PMA – also retain the right to discipline any longshoremen for 'incompetence, insubordination or failure to perform the work as required in conformance with the provisions of [the CBA].'  The CBA lays out an extensive system for maintaining discipline, safety, and conformity with the master labor agreement on the docks, but these provisions place the burden of meeting these standards on the longshoremen, the Union, and the member-employers and their supervisors – not PMA.

*Id.* at 926.   This Court went on to explain the various additional ways in which PMA had no control over the conditions under which the longshoremen worked.   "It does not supervise the longshoremen.   It has no power to hire or fire the longshoremen.   It has no power to discipline longshoremen.   It does not supervise the work sites of its member-employees.   It is undisputed that the monitoring and control over those sites, as well as the control of the employees, is within the *sole* province of the member-employers." *Id.* at 927 (Emphasis supplied).

Under these circumstances, this Court held that the PMA could not be held liable under Title VII for the workplace conditions encountered by the plaintiff longshoremen. This Court stated its reasoning for the decision in a lengthy discussion of the *Sibley* opinion, and the Ninth Circuit cases on the issue that followed, and succinctly summarized its analysis as follows:

> In light of these facts, we think the imposition of indirect-employer liability under Title VII inappropriate. *Sibley* and its Ninth Circuit progeny condone liability where there exists discriminatory 'interference' by the indirect employer and where the indirect employer had some ***peculiar control*** over the employee's relationship with the direct employer. Here, there was no such interference by PMA. ***It did not cause the hostile work environment.*** And its power to stop the hostile work environment was so limited that it cannot be said to have 'interfered' by failing to take corrective measures to stop the harassment when the power to take those measures belonged to the member-employers.

*Id.* at 932 (Emphasis added).

As applied to the present case, *Sibley* and its Ninth Circuit progeny require that NEA's summary judgment request be denied. NEA both "interfered" with plaintiff-intervenors' employment opportunities at NEA-Alaska, and enjoyed "peculiar control" over their relationship with NEA-Alaska. NEA "interfered" with the intervenors' employment opportunities by placing a known harasser of women in the NEA-Alaska workplace. Viewing the facts in a light most favorable to plaintiffs, NEA had detailed knowledge concerning Harvey's prior harassment

25

of women, both at the time that he was approved for participation in the USEDP, and at the time of his assignment by NEA to its Alaska affiliate. Placing Harvey in the NEA-Alaska workplace "interfered" with plaintiff-intervenors' ability to work in an environment free of harassment and intimidation. This constituted a violation of Title VII, under *Sibley* and its progeny.

As was noted in both *Sibley* and *AMAE*, "To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited." *AMAE*, 231 F.2d at 580, *quoting Sibley*, 488 F.2d at 1341. If Carol Christopher, Julie Bhend and Carmela Chamara had been directly employed by NEA, the placement by NEA of a known harasser as their supervisor, with resulting harm, would have constituted a violation of Title VII. *See, E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1515-16 (9th Cir. 1989) (Holding that "employers are liable for failing to remedy *or prevent* a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." (Emphasis supplied)) By assigning a known harasser to be a supervisor at its Alaska affiliate, NEA failed to prevent the hostile work environment that was encountered by the intervenors at NEA-Alaska. NEA should

26

not be allowed to escape its obligations as a covered employer under Title VII just because it did not issue paychecks to the plaintiff-intervenors. To do so "would be to condone continued use of the very criteria for employment that Congress has prohibited." *AMAE*, 231 F.2d at 580, *quoting Sibley*, 488 F.2d at 1341.

Unlike the defendant association in *Anderson*, NEA was directly involved in setting the terms and conditions of employment at NEA-Alaska. NEA sent *its own employees* to manage the workplace at NEA-Alaska. Harvey was an NEA employee when he came to Alaska. Vernon Marshall, the Executive Director of NEA-Alaska during the events at issue in this case, was an NEA employee, as a participant in the USEDP. ER 452. NEA had guidelines for the retention, evaluation, training, salary, benefits, and termination of these managers. Other NEA managers were responsible for assigning Harvey to Alaska. The defendant association in *Anderson* had *nothing* to do with work environment encountered by the plaintiff employees; NEA had *everything* to do with creating the work environment faced by the plaintiff-intervenors here. In *Anderson*, the court stated that the defendant association "did not cause the hostile work environment" at issue there. 336 F.3d at 932. Here, NEA *directly* caused the hostile work environment, by sending the supervisor responsible for creating the hostile work environment into the NEA-Alaska workplace.

In *AMAE*, the court noted that the relationship between the State of California and its local school districts was akin to the relationship between a parent and subsidiary corporation, and certainly that analogy would hold true for the relationship between NEA and NEA-Alaska. As was also noted in *AMAE*, a parent corporation could not be held liable for violations of Title VII by its subsidiary, unless "there was... evidence that [the parent] participated in or influenced the employment policies of [the subsidiary]..." *AMAE*, 231 F.3d at 582, *quoting Watson*, 650 F.2d at 993. In this case, NEA did influence the employment policies of NEA-Alaska, by having its own employees supervise the workplace. One NEA employee, Thomas Harvey, engaged in the discriminatory practices at issue in the case. Another NEA employee, Vernon Marshall, failed to remedy the hostile work environment encountered by plaintiff-intervenors. NEA can attempt to run from Harvey and Marshall, but it cannot hide. They were both NEA employees. They were both subject to NEA guidelines concerning their hiring, evaluation, training, performance and termination. Other NEA employees, Larry Diebold and Nelson Okino, were instrumental in assigning Harvey to Alaska. There can be no question that NEA, through its employees, was instrumental both in setting the terms and conditions of NEA-Alaska employees, including the intervenors, and in influencing the policies of employment applicable there.

In her dissent in *Anderson*, Judge Fletcher noted that this Court has "adopted

28

a broad interpretation of *Sibley*, with the caveat that 'there must be some connection with an employment relationship for Title VII protections to apply.'" 336 F.2d at 939, *quoting Lutcher*, 633 F.2d at 883. There is nothing in *Anderson* that departs from that "broad interpretation of *Sibley*." *Anderson* involved an association that had no influence on any aspect of the terms and conditions of the plaintiff employees. As has been shown, NEA had a significant influence on the terms and conditions of plaintiff-intervenors' employment. NEA's conduct certainly had a "connection" - a significant connection - with the employment relationship between plaintiff-intervenors and NEA-Alaska. Under such circumstances, *Sibley* should be applicable to hold NEA responsible for violations of Title VII.

D.    CONCLUSION

The Order granting summary judgment should be reversed and this case should be remanded for further proceedings and a jury trial.

DATED this /5ᵗʰ day of December, 2004.

For    Kenneth R. Friedman                    For    Terry A. Venneberg
       Friedman, Rubin & White                        Attorney at Law

# Terry A. Venneberg

### Attorney at Law
#### Old City Hall

Phone: (253) 572-3467
Fax:     (253) 572-3662

625 Commerce Street, Suite 460
Tacoma, Washington 98402

Admitted in WA and AK

<u>SENT VIA FACSIMILE TRANSMISSION (907) 586-3065 AND (202) 842-1888</u>

November 17, 2004

Leslie Longenbaugh, Esq.
Simpson, Tillinghast, Sorensen & Longenbaugh, PC
One Sealaska Plaza, Suite 300
Juneau, Alaska 99801

Jeremiah A. Collins, Esq.
Bredhoff & Kaiser, PLLC
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005

Re: *EEOC and Christopher, et.al. v. NEA and NEA-Alaska*
    Case No. 04-35029/04-35201

Dear Leslie and Jeremiah:

    The Clerk's Office at the Ninth Circuit Court of Appeals has granted plaintiff-intervenors-appellants' telephonic request for a 14-day extension of time to file their Reply Brief in this matter. Plaintiff-intervenors-appellants' Reply Brief is now due on December 17, 2004. This notice is provided to you pursuant to Section E.3. of the Case Processing Information issued by the Ninth Circuit. A copy of this letter will be filed with plaintiff-intervenors-appellants' Reply Brief.

Very truly yours,

Terry A. Venneberg

TAV
cc: Kenneth R. Friedman, Esq.
    Jennifer Goldstein, Esq.

## STATUTES CITED

**FEDERAL STATUTE**

42 U.S.C. § 2000e-2(a)

a)  Employer practices

It shall be an unlawful employment practice for an employer –

(1)    to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2)    to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

## STATEMENT OF RELATED CASES

Plaintiff-Intervenors are not aware of any cases in this Court that are related within the meaning of Ninth Circuit Rule 28-2.6.

Kenneth R. Friedman
Friedman, Rubin & White
1126 Highland Avenue
Bremerton, WA 98337
(360) 782-4300

## CERTIFICATE OF COMPLIANCE WITH RULE 32-1

I hereby certify that the brief is proportionately spaced, has a type face of 14 points or more and according to the word-count facility in Microsoft Word – this brief, excluding those portions omitted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), consists of 6,493 words and thus complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

For  Kenneth R. Friedman
Friedman, Rubin & White
1126 Highland Avenue
Bremerton, WA  98337
(360) 782-4300

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December, 2004, I served two

copies of the foregoing Reply Brief for the Plaintiff-Intervenors-Appellants

via U.S. Priority Mail on Appellees herein at the following address:

Leslie Longenbaugh
Simpson, Tillinghast,
Sorensen & Longenbaugh
One Sealaska Plaza, Suite 300
Juneau, AK  99801
(907) 586-1400

Jeremiah A. Collins
Bredhoff & Kaiser, PLLC
805 Fifteenth Street N.W.
Washington D.C.  20005
(202) 842-2600

Jennifer Goldstein
Equal Employment
Opportunity Commission
1801 L Street NW, 7th Floor
Washington, DC  20507

Kenneth R. Friedman
Friedman, Rubin & White
1126 Highland Avenue
Bremerton, WA  98337
(360) 782-4300